IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

FEB 1 3 2019

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>STATE OF GEORGIA,<br>ex rel., Kenneth Russell and<br>Yvette Gates,<br><br>      Plaintiff / Relators,<br><br>vs.<br><br><br><br>UNIVERSAL HEALTH CARE<br>SERVICES, INC.; UHS ANCHOR,<br>L.P., d/b/a/ ANCHOR HOSPITAL<br><br><br><br><br>      Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

CIVIL ACTION FILE

NO. 1 19-CV-0764

FILED IN CAMERA
AND UNDER SEAL
DO NOT SERVE DEFENDANT

(Trial by Jury Demanded)

## QUI TAM COMPLAINT

COMES NOW Kenneth Russell and Yvette Gates, Relators, by and through undersigned counsel, before this Honorable Court on behalf of themselves, the United States of America, its departments and agencies, and the State of Georgia and brings this action against Defendants Universal Health Services and Anchor Hospital for money damages and civil penalties arising out of Defendants' violations of the False Claims Act, 31 U.S.C. § 3729 et seq., and the Georgia State False Medicaid Claims Act, O.C.G.A. §§ 49-4-168 *et seq* which violations are described hereinafter with particularity.

## JURISDICTIONAL ALLEGATIONS

1.     Jurisdiction is conferred pursuant to the False Claims Act, 31 U.S.C.A. §§ 3730(b) and 3732 in as much as this action seeks remedies on behalf of the United States for violations of 31 U.S.C.A. § 3729 *et seq.* by Defendant. This Court also has jurisdiction pursuant to 28 U.S.C. § 1345, 28 U.S.C. §1331 and 28 U.S.C. §1367.

2.     Relators Kenneth Russell and Yvette Gates acting on behalf of the United States brings this civil action under the Qui Tam provisions of the False Claims Act, as amended.

3.     Relator Kenneth Russell is a citizen of the United States and a resident of the State of Georgia.

4.     Relator Yvette Gates is a citizen of the United States and a resident of the State of Georgia.

5.     Defendant Universal Health Services, Inc. (hereinafter "UHS") is a corporation organized pursuant to the laws of the State of Pennsylvania with its principal place of business in King of Prussia, Pennsylvania.

6.     Defendant UHS of Anchor, L.P., d/b/a Anchor Hospital (hereinafter ("Anchor" or "Anchor Hospital") is a corporation organized pursuant to the laws of the State of Delaware with its principal place of business in Atlanta, Georgia.

7.     Defendant UHS is a for-profit corporation that owns and operates hospitals and health facilities throughout the United States and the State of Georgia.

8.     UHS owns and operates Anchor Hospital.

9.     Anchor Hospital is an Inpatient Psychiatric Facility ("IPF") as that term is defined by Medicare.

8.    As required under the False Claims Act, 31 U.S.C.A § 3730(a)(2), the Relator has provided the United States with a statement of all material evidence and information related to the Complaint.

9.    This action is brought on behalf of the United States to recover all damages, penalties and other remedies established by and pursuant to 31 U.S.C.A. §§ 3729-3733, and Relators Kenneth Russell and Yvette Gates' claims entitlement to a portion of any recovery obtained by the United States as qui tam plaintiff authorized by 31 U.S.C.A. §3730.

10.    As required under the Georgia State False Medicaid Claims Act, O.C.G.A. § 49-4-168.2, the Relator has provided the State of Georgia's Attorney General with a statement of all material evidence and information related to the Complaint.

11.    This action is also brought on behalf of the State of Georgia to recover all damages, penalties and other remedies established by and pursuant to O.C.G.A. § 49-4-168.1, and Relators Kenneth Russell and Yvette Gates' claims entitlement to a portion of any recovery obtained by the United States as qui tam plaintiff authorized by O.C.G.A. § 49-4-168.2.

12.    Venue is proper pursuant to 28 U.S.C.A §1391(a) in that Defendant UHS and Anchor are corporations with their respective principal places of business in this judicial district.

13.    The statute of limitations in this case extends back six years from the original filing of this litigation. See 31 U.SC. §3731(b)(1).

I.      **MEDICARE CERTIFICATIONS and REGULATIONS**

14.     Medicare providers are required to enter into a provider agreement with the Government. Under the terms of the provider agreement, the Medicare provider must certify that it will comply with all laws and regulations concerning proper practices for Medicare providers. A provider's compliance with its provider agreement, including its certification of compliance with all applicable laws and regulations, is a condition for receipt of payments from the Medicare program.

15.     Universal Health and Anchor submitted Medicare Enrollment Applications in order to become enrolled in the Medicare program. Part of the Medicare Application requires all providers, including Universal Health and Anchor, to sign a Certification Statement stating "I agree to abide by the Medicare laws, regulations and program instructions that apply to me...I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions and on the supplier's compliance with all applicable conditions of participation in Medicare."

16.     The certification statements in the Medicare Provider Applications signed by Universal Health and Anchor also require all providers to certify that "I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity."

17.     Medicaid Providers are similarly required to enter into a provider agreement with the Government. Under the terms of the provider agreement, the Medicaid provider must certify that it will abide by all laws and regulations concerning proper practices for

Medicaid providers. A Medicaid provider's compliance with its provider agreement is a condition for receipt of payments from the Medicaid program.

18.     Universal Health and Anchor Medicaid execute Enrollment Applications in order to become enrolled in the Medicaid program. Part of the Medicaid Application provides that . . . "I expressly agree to the following: to abide by all applicable federal and state statutes, regulations, policy transmittals, and provider bulletins. . ."

19.     Further, the Medicaid Provider Enrollment Agreement, which all providers including Universal Health and Anchor must sign, provides, "Provider represents and agrees as follows: . . . To comply with state and federal law . . . Provider acknowledges and understands that the prohibitions set forth in state and federal law include, but are not limited to . . . false statements, claims, misrepresentations . . . any giving or seeking of kickbacks, rebates or similar remuneration . . ."

20.     The Medicare and Medicaid Provider certification statements signed by Universal Health and Anchor were false because Universal Health and Anchor are not in compliance with federal and state laws, regulations, program instructions, policy transmittals and bulletins.

21.     Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 et seq., establishes the Health Insurance for the Aged and Disabled Program, commonly referred to as the Medicare Program (the "Medicare Program" or "Medicare").

22.     The Government provides reimbursement for Medicare claims through the Centers for Medicare and Medicaid Services ("CMS"). In order to be entitled to reimbursement from CMS, an Inpatient Psychiatric Facility ("IPF") such as Anchor must comply with "Medicare Benefit Policy Manual, Chapter 2-Inpatient Psychiatric Hospital

Services."   These CMS rules and policies govern the services and care that must be afforded to patients before an IPF is entitled to reimbursement by the Government.

23.     Each IPF patient must receive a psychiatric evaluation that must: (1) be completed within 60 hours of admission; (2) include a medical history; (3) contain a record of mental status; (4) note the onset of illness and the circumstances leading to admission; (5) describe attitudes and behavior; (6) estimate intellectual functioning, memory functioning, and orientation; and (7) include an inventory of the patient's assets in descriptive, not interpretative fashion.[1]

24.     Further, CMS regulations and rules allow reimbursement for Diagnostic Psychiatric Evaluations or Assessments under the Current Procedural Terminology ("CPT") code 90791 or 90792.  Assessments conducted by non-physicians may be billed under CPT code 90791.  However, assessments billed under CPT code 90792 can only be billed by a psychiatrist (M.D.)  or an advanced practice registered nurse (APRN).

25.     Medicare and Medicaid reimburse IPFs and mental and behavioral healthcare professionals for a minimum of one hour and a maximum of two hours for assessments billed pursuant to CPT code 90791 or 9072.

26.     Additionally, payment by Medicare and Medicaid for IPF services are made only for "active treatment" that can reasonably be expected to improve the patient's condition.[2]

27.     For services in an IPF to be designated as active treatment, they must be:

- Provided under an individualized treatment or diagnostic plan

---

[1] See MEDICARE BENEFIT POLICY MANUAL, Chapter 12, Section 30.2 (Rev. 223, 05-13-16) https://www.cms.gov.
[2] Id. See Section 30.2.2.

- Reasonably expected to improve the patient's conditions or for the purpose of diagnosis; and

- Supervised and evaluated by a physician.[3]

28.  Proper supervision is an express pre-condition that must be satisfied before an IPF such as Anchor can seek reimbursement.[4]

## II.  MEDICARE, MEDICAID AND GEORGIA LAW REQUIREMENTS CONCERNING CHEMICAL RESTRAINTS AND SECLUSION

29.  Medicare and Medicaid define "restraint" as "[a]ny manual method, physical or mechanical device, material, or equipment that immobilizes or reduces the ability of a patient to move his or her arms, legs, body, or head freely; or  A drug or medication when it is used as a restriction to manage the patient's behavior or restrict the patient's freedom of movement and is not a standard treatment or dosage for the patient's condition."[5]

30.  Further, Medicare and Medicaid  define "seclusion" as the involuntary confinement of a patient alone in a room or area from which the patient is physically prevented from leaving. Seclusion may only be used for the management of violent or self-destructive behavior."[6]

31.  Under Medicare and Medicaid rules and regulations restraint or seclusion may only be used when less restrictive interventions have been determined to be ineffective to protect the patient a staff member or others from harm.[7]

32.  The type or technique of restraint or seclusion used must be the least

---

[3] Id. See Section 30.2.2.1.
[4] Id.
[5] 42 C.F.R. 482(e)(1)(i)(A) and (B).
[6] 42 C.F.R. 482(e)(1)(ii).
[7] 42 C.F.R. 482(e)(2).

restrictive intervention that will be effective to protect the patient, a staff member, or others from harm.[8]

33.     In addition, under Medicare and Medicaid rules and regulations the use of restraint or seclusion must be in accordance with the order of a physician or other licensed independent practitioner who is responsible for the care of the patient and authorized to order restraint or seclusion by hospital policy in accordance with State law. [9]

34.     Also, Medicare and Medicaid rules and regulations require that orders for the use of restraint or seclusion must never be written as a standing order or on an as needed basis and require the attending physician must be consulted as soon as possible if the attending physician did not order the restraint or seclusion.[10]

35.     Further, under Georgia law, all medication, seclusion, or physical restraints are to be used *solely* for the purposes of providing effective treatment and protecting the safety of the patient and other persons. [11]  Consequently, Georgia law does not permit the use of chemical restraints for discipline or punishment.

36.     At all material times herein, the Defendants have engaged in the improper use of chemical restraints and seclusion.

37.     As set forth below, for example, the Defendants have routinely and consistently allowed nurses and medical staff to administer chemical restraints without an order from an physician or licensed independent practitioner as defined under Medicare and Medicaid regulations.  Further, the Defendants have permitted chemical restraints to be used when such restraints were not the least restrictive measure and when chemical

---

[8] 42 C.F.R. 482(e)(3).
[9] 42 C.F.R. 482(e)(5).
[10] 42 C.F.R. 482(e)(6) and (7).
[11] O.C.G.A. §37-3-165.

restraints and seclusion were administered to the Defendants' patients as a form of discipline or punishment.

38.    The Defendants' actions, as set forth below, are in violation of Medicare and Medicaid's rules and regulations that are an express and/or implied conditions for reimbursement. Defendants' actions are also a violation of Defendants' express and/or certifications to Medicare and Medicaid.  Further, the Defendants' actions are in violation of Georgia law concerning restraint and/or seclusion which, in turn, is also an express and/or implied violation of Defendants certifications to Medicare and Medicaid.

### III.      FACTUAL ALLEGATIONS

39.    Based on the Relators' firsthand knowledge acquired from working with the Defendants, approximately ninety (90%) of the patients that receive mental health care at Anchor pay for the health care services provided with either Medicare, Medicaid or TRICARE insurance.

40.    Relator Kenneth Russell began working for Defendants UHS and Anchor on or about February 20, 2017 as a Mental Health Technician. Relator Russell worked for Anchor until July 2017.

41.    As a Mental Health Technician, Relator Russell's job consisted of aiding and assisting in the care of mentally ill and emotionally disturbed patients at Anchor. Relator Russell's typical duties consisted of escorting patients to various locations in the hospital and identifying the needs of patients at Anchor.

42.    Relator Yvette Gates began working for Defendants UHS and Anchor on or about May 15, 2017 as a licensed Professional Counselor. Relator Gates worked for Anchor until August 7, 2017.

43.     As a licensed Professional Counselor, Relator Gates' job consisted of conducting Diagnostic Psychiatric Evaluations or Assessments, diagnosing mental and emotional disorders and providing therapy to patients in an individual and/or group setting.

44.     On or about May 15, 2017, in Atlanta, Georgia, as part of her job duties, Relator Gates conducted Diagnostic Psychiatric Evaluations or Assessments.

45.     CMS permits Anchor to bill a minimum of one hour up to a maximum of two hours to Medicare and/or Medicaid for diagnostic psychiatric assessments.

46.     On or about May 15, 2017, in Atlanta, Georgia relator Gates conducted several diagnostic psychiatric assessments on Medicare and Medicaid patients.   Each assessment lasted from one to one and a half hours for each patient, respectively.

47.     The industry standard concerning the length of time it takes to conduct diagnostic psychiatric assessments on a given patient is one to two hours.

48.     On or about May 15, 2017, in Atlanta, Georgia Relator Gates, was instructed by Anchor's Assessment Referral Services director (ARS), Ekom Essien, to spend no more than 30 minutes per patient when conducting diagnostic psychiatric assessments.

49.     Specifically, on or about May 15, 2017 and throughout her employment with Anchor, ARS director Essien informed Relator Gates and other Anchor employees performing diagnostic psychiatric assessments that all such assessments for respective patients must be completed in no more than 30 minutes.

50.     Consequently, from May 15, 2017 through August 7, 2017, in Anchor's Atlanta, Georgia hospital, Defendant Anchor consistently and routinely conducted diagnostic psychiatric assessments in 30-minute increments when said assessments

required at least one hour of time in or to be conducted adequately.

51.     Further, from May 15, 2017 through August 7, 2017, in Anchor's Atlanta, Georgia hospital, Defendant Anchor billed Medicare and Medicaid under CPT code 90791 for one hour of treatment for each respective patient.

52.     From May 15, 2017 through August 7, 2017, in Anchor's Atlanta, Georgia hospital Relator Gates worked the second shift for Defendant Anchor from 3pm -11:30pm in Anchor's ARS department. The second shift in the ARS department consisted of Relator Gates and two other counselors.

53.     From May 15, 2017 through August 7, 2017, in Anchor's Atlanta, Georgia hospital Relator Gates and the two additional counselors performed approximately 20 diagnostic psychiatric assessments for Medicare and/or Medicaid patients, three days per week.     Each of the foregoing diagnostic assessments were conducted in 30 minutes, however, Anchor billed CMS for one to two hours under CPT code 90791.

54.     At no time has either Defendant Anchor or UHS ever returned any overpayments to CMS associated with diagnostic psychiatric assessments by Anchor's ARS employees including, but not limited to, assessments conducted by Relator Gates or others on the ARS department's second shift.

55.     Because the diagnostic psychiatric assessments are done in an abbreviated and rushed manner, many of Defendant Anchor's patients are not accurately being diagnosed for mental illnesses.   Rather, Defendants UHS and Anchor routinely admit patients based on a financial objective, to wit:  to get Medicare and Medicaid patients in a hospital bed at Anchor as soon as possible without properly screening the patient first.

56.     The quicker the admission process starts at Anchor, the quicker the patient

can get a bed and Medicare and/or Medicaid payment began for that individual.

57.     For example, from February 2017 through May 2017, 130 Medicare and Medicaid patients were admitted as in-patients at Anchor Hospital in Atlanta, Georgia. All of the 130 patients were diagnosed with psychosis. However, the overwhelming majority of these patients were not experiencing psychosis and/or were not mentally ill when they were admitted.

58.     The proof that the majority of the foregoing individuals did not experience psychosis and/or were not mentally ill at admission is evidenced by the fact these patients were only administered Ativan, Motrin and Benadryl for their medication during their stay at Anchor hospital as opposed to psychotropic medications to treat their alleged symptoms. The foregoing is a common practice by the Defendants at Anchor Hospital.

59.     Another common practice by the Defendants UHS and Anchor involves using psychotropic drugs as a sedative to discipline and restrain patients at Anchor Hospital.

60.     From at least February 20, 2017 through the present, in Atlanta, Georgia, Defendants Anchor and UHS used psychotropic drugs to sedate and chemically restrain patients at Anchor Hospital.

61.     Specifically, from at least February 20, 2017 to the present, in Anchor's Atlanta, Georgia hospital staffers employed by   Defendants UHS and Anchor routinely injected patients with powerful sedative drugs as a form of chemical restraint of the patient and as a form of discipline for the patients.

62.     The sedative drugs were comprised of anti-psychotic drugs and were commonly referred to as "booty juice" injections by the employees of UHS and Anchor.

12

The so-called "booty juice" was comprised of the anti-psychotic drugs Haldol or Mellaril.

63.    Once patients are given the booty juice injections as a form of discipline or restraint they are then secluded in a secured room where they are monitored by cameras by non-physician staff of Defendants UHS and Anchor.

64.    From February 2017 through the present, Medical Technicians escorted patients to nurses at Anchor so that the patient could be injected with booty juice on a daily basis from Monday through Sunday. Likewise, these patients were secluded following the booty juice injection as an additional form of discipline.

65.    Specific instances where Medicare and Medicaid patients were chemically restrained with booty juice injections in violation Medicaid and/or Medicaid rules, policies and regulations include, but are not exclusive of or limited to, the following instances below.

66.    In or about November 2016, in Atlanta, Georgia, patient L.B. was given a booty juice injection as a chemical restraint and secluded in a room as a form of discipline. The injection given to L.B. was not prescribed, ordered or administered by a psychiatrist or other physician. No psychiatrist or physician supervised the individual administering the booty juice injection nor did any psychiatrist or physician have a face-to-face consultation or follow-up with the patient following the injection / chemical restraint and seclusion. The anti-psychotic medicine used in the booty juice injection described above was billed to CMS.

67.    In or about February 2017, in Atlanta, Georgia, patient J.S. was given a booty juice injection as a chemical restraint and secluded in a room as a form of discipline. The injection given to J.S. was not prescribed, ordered or administered by a psychiatrist or

other physician. No psychiatrist or physician supervised the individual administering the booty juice injection nor did any psychiatrist or physician have a face-to-face consultation or follow-up with the patient following the injection / chemical restraint and seclusion. The anti-psychotic medicine used in the booty juice injection described above was billed to CMS.

68.     In or about February 2017, in Atlanta, Georgia, patient S.G. was given a booty juice injection as a chemical restraint and secluded in a room as a form of discipline. The injection given to S.G. was not prescribed, ordered or administered by a psychiatrist or other physician. No psychiatrist or physician supervised the individual administering the booty juice injection nor did any psychiatrist or physician have a face-to-face consultation or follow-up with the patient following the injection / chemical restraint and seclusion. The anti-psychotic medicine used in the booty juice injection described above was billed to CMS.

69.     In or about February 2017, in Atlanta, Georgia, patient R.C. was given a booty juice injection as a chemical restraint and secluded in a room as a form of discipline. The injection given to R.C. was not prescribed, ordered or administered by a psychiatrist or other physician. No psychiatrist or physician supervised the individual administering the booty juice injection nor did any psychiatrist or physician have a face-to-face consultation or follow-up with the patient following the injection / chemical restraint and seclusion. The anti-psychotic medicine used in the booty juice injection described above was billed to CMS.

70.     In or about March 2017, in Atlanta, Georgia, patient R.P. was given a booty juice injection as a chemical restraint and secluded in a room as a form of discipline. The

14

injection given to R.P. was not prescribed, ordered or administered by a psychiatrist or other physician. No psychiatrist or physician supervised the individual administering the booty juice injection nor did any psychiatrist or physician have a face-to-face consultation or follow-up with the patient following the injection / chemical restraint and seclusion. The anti-psychotic medicine used in the booty juice injection described above was billed to CMS.

71.     In or about March 2017, in Atlanta, Georgia, patient K.M. was given a booty juice injection as a chemical restraint and secluded in a room as a form of discipline. The injection given to K.M. was not prescribed, ordered or administered by a psychiatrist or other physician. No psychiatrist or physician supervised the individual administering the booty juice injection nor did any psychiatrist or physician have a face-to-face consultation or follow-up with the patient following the injection / chemical restraint and seclusion. The anti-psychotic medicine used in the booty juice injection described above was billed to CMS.

72.     In or about March 2017, in Atlanta, Georgia, patient M.G. was given a booty juice injection as a chemical restraint and secluded in a room as a form of discipline. The injection given to M.G. was not prescribed, ordered or administered by a psychiatrist or other physician. No psychiatrist or physician supervised the individual administering the booty juice injection nor did any psychiatrist or physician have a face-to-face consultation or follow-up with the patient following the injection / chemical restraint and seclusion. The anti-psychotic medicine used in the booty juice injection described above was billed to CMS.

73.     In or about April 2017, in Atlanta, Georgia, patient A.B. was given a booty

juice injection as a chemical restraint and secluded in a room as a form of discipline. The injection given to A.B. was not prescribed, ordered or administered by a psychiatrist or other physician. No psychiatrist or physician supervised the individual administering the booty juice injection nor did any psychiatrist or physician have a face-to-face consultation or follow-up with the patient following the injection / chemical restraint and seclusion. The anti-psychotic medicine used in the booty juice injection described above was billed to CMS.

74. In or about April 2017, in Atlanta, Georgia, patient D.G. was given a booty juice injection as a chemical restraint and secluded in a room as a form of discipline. The injection given to D.G. was not prescribed, ordered or administered by a psychiatrist or other physician. No psychiatrist or physician supervised the individual administering the booty juice injection nor did any psychiatrist or physician have a face-to-face consultation or follow-up with the patient following the injection / chemical restraint and seclusion. The anti-psychotic medicine used in the booty juice injection described above was billed to CMS.

75. In or about April 2017, in Atlanta, Georgia, patient M.M. was given a booty juice injection as a chemical restraint and secluded in a room as form of a discipline. The injection given to M.M. was not prescribed, ordered or administered by a psychiatrist or other physician. No psychiatrist or physician supervised the individual administering the booty juice injection nor did any psychiatrist or physician have a face-to-face consultation or follow-up with the patient following the injection / chemical restraint and seclusion. The anti-psychotic medicine used in the booty juice injection described above was billed to CMS.

76.    In or about May 2017, in Atlanta, Georgia, patient J.L. was given a booty juice injection as a chemical restraint and secluded in a room as a form of discipline. The injection given to J.L. was not prescribed, ordered or administered by a psychiatrist or other physician. No psychiatrist or physician supervised the individual administering the booty juice injection nor did any psychiatrist or physician have a face-to-face consultation or follow-up with the patient following the injection / chemical restraint and seclusion. The anti-psychotic medicine used in the booty juice injection described above was billed to CMS.

77.    In or about May 2017, in Atlanta, Georgia, patient I.G. was given a booty juice injection as a chemical restraint and secluded in a room as a form of discipline. The injection given to I.G. was not prescribed, ordered or administered by a psychiatrist or other physician. No psychiatrist or physician supervised the individual administering the booty juice injection nor did any psychiatrist or physician have a face-to-face consultation or follow-up with the patient following the injection / chemical restraint and seclusion. The anti-psychotic medicine used in the booty juice injection described above was billed to CMS.

78.    In or about May 2017, in Atlanta, Georgia, patient A.B. was given a booty juice injection as a chemical restraint and secluded in a room as a form of discipline. The injection given to A.B. was not prescribed, ordered or administered by a psychiatrist or other physician. No psychiatrist or physician supervised the individual administering the booty juice injection nor did any psychiatrist or physician have a face-to-face consultation or follow-up with the patient following the injection / chemical restraint and seclusion. The anti-psychotic medicine used in the booty juice injection described above was billed to

CMS.

79.    In or about June 2017, in Atlanta, Georgia, patient A.G. was given a booty juice injection as a chemical restraint and secluded in a room as a form of discipline. The injection given to A.G. was not prescribed, ordered or administered by a psychiatrist or other physician. No psychiatrist or physician supervised the individual administering the booty juice injection nor did any psychiatrist or physician have a face-to-face consultation or follow-up with the patient following the injection / chemical restraint and seclusion. The anti-psychotic medicine used in the booty juice injection described above was billed to CMS.

80.    In or about June 2017, in Atlanta, Georgia, patient Z.J. was given a booty juice injection as a chemical restraint and secluded in a room as a form of discipline. The injection given to Z.J. was not prescribed, ordered or administered by a psychiatrist or other physician. No psychiatrist or physician supervised the individual administering the booty juice injection nor did any psychiatrist or physician have a face-to-face consultation or follow-up with the patient following the injection / chemical restraint and seclusion. The anti-psychotic medicine used in the booty juice injection described above was billed to CMS.

81.    In or about June 2017, in Atlanta, Georgia, patient C.S. was given a booty juice injection as a chemical restraint and secluded in a room as a form of discipline. The injection given to C.S. was not prescribed, ordered or administered by a psychiatrist or other physician. No psychiatrist or physician supervised the individual administering the booty juice injection nor did any psychiatrist or physician have a face-to-face consultation or follow-up with the patient following the injection / chemical restraint and seclusion. The

anti-psychotic medicine used in the booty juice injection described above was billed to CMS.

82.    In or about September 2018, in Atlanta, Georgia, patient E.W. was given a booty juice injection as a chemical restraint and secluded in a room as a form of discipline. The injection given to E.W. was not prescribed, ordered or administered by a psychiatrist or other physician. No psychiatrist or physician supervised the individual administering the booty juice injection nor did any psychiatrist or physician have a face-to-face consultation or follow-up with the patient following the injection / chemical restraint and seclusion. The anti-psychotic medicine used in the booty juice injection described above was billed to CMS.

83.    In or about September 2018, in Atlanta, Georgia, patient J.D. was given a booty juice injection as a chemical restraint and secluded in a room as a form of discipline. The injection given to J.D. was not prescribed, ordered or administered by a psychiatrist or other physician. No psychiatrist or physician supervised the individual administering the booty juice injection nor did any psychiatrist or physician have a face-to-face consultation or follow-up with the patient following the injection / chemical restraint and seclusion. As a result of the booty juice /chemical restraint injection, patient J.D. overdosed and died. The anti-psychotic medicine used in the booty juice injection described above was billed to CMS.

84.    By and through its billings to the Government, the Defendants have violated Medicare rules, policies and regulations, violated the State of Georgia Medicaid's rules and regulations regarding the restraint and seclusion on mental health patients and by so doing have falsely represented to both the federal Government and State of Georgia the

true nature and circumstances concerning the Defendants' Medicare and Medicaid billings.

85. The United States and the State of Georgia have been damaged because of the acts of the Defendants UHS and Anchor in submitting or causing to be submitted, the false claims, statements and records in that the United States and State of Georgia have paid the Defendants millions of dollars for items and services for which the Defendants were not entitled to reimbursement.

86. The Defendants profited unlawfully from the payment of illegal remuneration to them.

87. The Relators were the only source, and the original source, of information contained in this Complaint.

## COUNT I
### (False Claims Act: Presentation of False Claims)
### (31 U.S.C. § 3729(a)(1)(A))

85. Relators re-allege all prior paragraphs of the Complaint as if set forth fully herein.

86. Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval to the United States, in the form of billings for reimbursement for services rendered to patients so that it could obtain illegal remuneration under the FCA. The claims were false and fraudulent because payment of the claims are and/or were conditioned on certifications that were false.

89. By virtue of the false or fraudulent claims knowingly made or caused to be made by Defendants, the United States suffered damages and therefore is entitled to statutory damages under the False Claims Act, to be determined by a jury plus a civil penalty for each violation.

90.     As set forth above, Defendants purposefully overbilled and/or falsely billed Medicare and Medicaid.  Consequently, Defendants' course of conduct violated the False Claims Act, 31 U.S.C. §§ 3729(a)(l)(A);  3729(a)(l)(B); & 3729(a)(1)(G).

WHEREFORE, Relators respectfully request that this Court enter judgment against Defendants Universal Health and Anchor, as follows:

(a)     That the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims and fraud alleged within this Complaint, as the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* provides;

(b)     That civil penalties of $11,463 to $22,927 and/or the civil penalties as allowed by law and amended by the Federal Civil Penalties Adjustment Act be imposed for each and every false claim that Defendants presented to the United States;

(c)     That pre - and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which the Relator necessarily incurred in bringing and pressing this case;

(d)     That the Court grant permanent injunctive relief to prevent any recurrence of the unlawful acts for which redress is sought in this Complaint;

(e)     That the Relators be awarded the maximum percentage of any recovery allowed pursuant the False Claims Act, 31 U.S.C. § 3730(d)(1), (2); and

(f)     That this Court award such other and further relief as it deems

proper.

## COUNT II
(False Claims Act: Making or Using False Record
or Statement to Cause Claim to be Paid)
(31 U.S.C. § 3729(a)(1)(B))

91.     Relators re-allege all prior paragraphs of the Complaint as if set forth fully herein.

92.     Defendants knowingly made, used or caused to be made or used, false records or statements material to false or fraudulent claims.

93.     By virtue of the false or fraudulent claims knowingly made or caused to be made by the Defendants, the United States suffered damages and therefore is entitled to statutory damages under the False Claims Act, to be determined by a jury plus a civil penalty for each violation.

94.     Defendants' course of conduct violated the False Claims Act, 31 U.S.C. §§ 3729(a)(l)(A); 3729(a)(l)(B); & 3729(a)(1)(G).

WHEREFORE, Relators respectfully request that this Court enter judgment against Defendants Universal Health and Anchor, as follows:

(a)     That the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims and fraud alleged within this Complaint, as the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* provides;

(b)     That civil penalties of $11,463 to $22,927 and/or the civil penalties as allowed by law and amended by the Federal Civil Penalties Adjustment Act be imposed for each and

22

every false claim that Defendants presented to the United States;

(c)    That pre - and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which the Relator necessarily incurred in bringing and pressing this case;

(d)    That the Court grant permanent injunctive relief to prevent any recurrence of the unlawful acts for which redress is sought in this Complaint;

(e)    That the Relators be awarded the maximum percentage of any recovery allowed pursuant the False Claims Act, 31 U.S.C. § 3730(d)(1), (2); and

(f)    That this Court award such other and further relief as it deems proper.

## **COUNT III**
(False Claims Act: Retaining Overpayments)
(31 U.S.C. § 3729(a)(1)(G))

95.    Relators re-allege all prior paragraphs of the Complaint as if set forth fully herein.

96.    Defendants Universal Health and Anchor knowingly made or used false or fraudulent statements, or caused false or fraudulent statements to be made or used, for the purpose of obtaining and retaining Medicare and Medicaid overpayments from the United States.

97.    Defendants submitted or caused to be submitted false or fraudulent claims to the Medicare and Medicaid programs that by statute and regulation are due to be returned once the overpayment is discovered within sixty days.

98.    However, Defendants knowingly withheld overpayments by the Medicare and Medicaid programs after identifying these overpayments sixty days earlier, in violation of federal statute and regulation.

99.    Had the United States known that Defendants were retaining overpayments, it would have promptly demanded repayment. The United States, unaware of the retention of overpayments by Defendants Universal Health and Anchor, has been damaged.

100.    Defendants course of conduct violated the False Claims Act, 31 U.S.C. §§ 3729(a)(1)(A); (B); and (G).

101.    Defendants have never refunded such overpayments to the Government and Universal Health and Anchor continue to retain such overpayments in violation of 31 U.S.C. § 3729(a)(1)(D). Defendants Universal Health and Anchor have knowingly and improperly avoided or decreased their obligation to transmit the windfall they have gained to the Government in violation of 31 U.S.C. § 3729(a)(1)(G).

WHEREFORE, Relators respectfully request that this Court enter judgment against Defendants Universal Health and Anchor, as follows:

(a) That the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims and fraud alleged within this Complaint, as the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* provides;

(b)    That civil penalties of $11,463 to $22,927 and/or the civil penalties as allowed by law and amended by the Federal Civil Penalties Adjustment Act be imposed for each and

every false claim that Defendants presented to the United States;

(c)     That pre - and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which the Relator necessarily incurred in bringing and pressing this case;

(d)     That the Court grant permanent injunctive relief to prevent any recurrence of the unlawful acts for which redress is sought in this Complaint;

(e)     That the Relators be awarded the maximum percentage of any recovery allowed pursuant the False Claims Act, 31 U.S.C. § 3730(d)(1), (2); and

(f)     That this Court award such other and further relief as it deems proper.

## COUNT IV
(Violations of Georgia State False Medicaid Claims Act: For False Billing)
(GA. CODE ANN. §§ 49-4-168 *et seq*)

102.    Relators re-allege all prior paragraphs of the Complaint as if set forth fully herein.

103.    Defendants knowingly made or used false or fraudulent statements, or caused false or fraudulent statements to be made or used, for the purpose of obtaining or aiding in obtaining the payment or approval of false Medicare or Medicaid claims by the State of Georgia.

104.    Defendants purposefully overbilled and/or falsely billed Georgia Medicaid.

105.    Defendants' course of conduct violated the Georgia State False Medicaid Claims Act, GA. CODE ANN. §§ 49-4-168 *et seq*.

WHEREFORE, Relators respectfully request that this Court enter judgment against Defendants Universal Health and Anchor, as follows:

(a)    That the State of Georgia be awarded damages in the amount of three times the damages sustained by the State because of the false claims and fraud alleged within this Complaint, as the Georgia State False Medicaid Claims Act, GA. CODE ANN. §§ 49-4-168 *et seq.*,;

(b)    That civil penalties of $11,463 to $22,927 be imposed for each and every false claim that Defendants presented to the State;

(c)    That pre - and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which the Relators necessarily incurred in bringing and pressing this case;

(d)    That the Court grant permanent injunctive relief to prevent any recurrence of the unlawful acts for which redress is sought in this Complaint;

(e)    That the Relators be awarded the maximum percentage of any recovery allowed pursuant the Georgia State False Medicaid Claims Act, GA. CODE ANN. §§ 49-4-168 *et seq,*.; and

(f)    That this Court award such other and further relief as it deems proper.

## COUNT V

(Violations of Georgia State False Medicaid Claims Act: For Concealing and
Retaining Overpayments)
(GA. CODE ANN. §§ 49-4-168 *et seq*)

106.    Relators re-allege all prior paragraphs of the Complaint as if set forth fully
herein.

107.    Defendants knowingly made or used false or fraudulent statements, or
caused false or fraudulent statements to be made or used, for the purpose of obtaining and
retaining Medicaid overpayments from the state of Georgia.

108.    Defendants Universal Health and Anchor submitted or caused to be
submitted false or fraudulent claims to the Medicaid program that by statute and
regulation are due to be returned once the overpayment is discovered within sixty days.

109.    However, Defendants knowingly withheld overpayments from the
Medicaid program after identifying these overpayments sixty days earlier, in of state
statute and regulation.

110.    Had the State of Georgia known that Defendants were retaining
overpayments, it would have promptly demanded repayment. The State of Georgia,
unaware of the retention of overpayments by Defendants, has been damaged.

111.    Defendants' course of conduct violated the Georgia State False Medicaid
Claims Act, GA. CODE ANN. §§ 49-4-168 *et seq.*

112.    Defendants never refunded such overpayments to the State of Georgia and
Defendants continue to retain such overpayments in violation of GA. CODE ANN. §§ 49-4-

168.1(a)(4). Defendants have knowingly and improperly avoided or decreased their obligation to transmit the windfall they have gained to the State of Georgia in violation of GA. CODE ANN. §§ 49-4-168.1(a)(7).

WHEREFORE, Relators respectfully request that this Court enter judgment against Defendants Universal Health and Anchor, as follows:

(a) That the State of Georgia be awarded damages in the amount of three times the damages sustained by the State because of the false claims and fraud alleged within this Complaint, as the Georgia State False Medicaid Claims Act, GA. CODE ANN. §§ 49-4-168 *et seq.*, provides;

(b) That civil penalties of $11,463 to $22,927 be imposed for each and every false claim that Defendants presented to the State;

(c) That pre - and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which the Relators necessarily incurred in bringing and pressing this case;

(d) That the Court grant permanent injunctive relief to prevent any recurrence of the unlawful acts for which redress is sought in this Complaint;

(e) That the Relators be awarded the maximum percentage of any recovery allowed pursuant the Georgia State False Medicaid Claims Act, GA. CODE ANN. §§ 49-4-168 *et seq.*,; and

(f) That this Court award such other and further relief as it deems proper.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs demands and pray for a jury trial and that judgment be entered in their favor against defendants for the amount of the United States' statutory damages and such civil penalties as are required and/or authorized by law, together with all such further relief as may be just and proper.

Respectfully submitted,

ARCHIE I. GRUBB, II (GA Bar No. 314384)
LARRY A. GOLSTON (Pro Hac Vice Pending)
LEON HAMPTON JR. (Pro Hac Vice Pending)
*Attorneys for Relator*

OF COUNSEL:

**BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P.C.**
272 Commerce Street
Montgomery, Alabama 36104
4200 Northside Parkway
Building One, Suite 100
Atlanta, Georgia 30327
T: (334) 269-2343 F: (334) 954-7555
T: (404) 751-1162 F: (855)674-1818
Email:  archie.grubb@beasleyallen.com
        larry.golston@beasleyallen.com
        leon.hampton@beasleyallen.com

## JURY DEMAND

PLAINTIFF HEREBY DEMANDS TRIAL BY JURY ON ALL ISSUES OF THIS CAUSE.

Of Counsel

**FILED IN CAMERA AND UNDER SEAL
DO NOT SERVE DEFENDANT**

29